*1509 Springer, C. J.,
concurring in part and dissenting in part:
I concur in the court’s opinion affirming the trial court’s judgment on the negligent undertaking claim; but I dissent to the court’s reversal of the punitive damage awards.[1]
Unlike my colleagues, I see this case as a case in which there is sufficient proof of implied malice for the jury to award punitive damages.
Punitive damages may be awarded where a defendant is guilty of malice. See NRS 42.005(1). Malice may be express or implied. Id. Express malice is present when a defendant “intended to injure a person.” NRS 42.001(3); see also Clark v. Lubritz, 113 Nev. 1089, 1099, 944 P.2d 861, 867 (1997). Implied malice is present where a defendant is guilty of “despicable conduct which is engaged in with a conscious disregard of the rights or safety of others.” NRS 42.001(3); Lubritz, 113 Nev. at 1099, 944 P.2d at 867. The jury rendered a special verdict that Dow Chemical had acted ‘ ‘with conscious disregard of the safety of others.’ ’ I see no reason for interfering with the jury’s special verdict and would, on the basis of that verdict, affirm the punitive damage judgment.
NRS 42.001 (1) defines conscious disregard as having “knowledge of the probable harmful consequences of a wrongful act and a willful and deliberate failure to act to avoid those consequences.” The special verdict finding that Dow Chemical was guilty of consciously disregarding the safety of Mrs. Mahlum, and others like her, in my view, is all that is necessary to support the punitive damage award in this case. In addition to finding the requisite conscious disregard, the jury filled out its special verdict with findings that Dow Chemical was actually aware of the danger posed by the breast implant (the danger, I would propose, that *1510 was created when Dow Chemical “work[ed] together in a joint development program” with Dow Corning, under the agreement in which Dow Chemical and Dow Corning “developed ... a body of technical information concerning the biological activity of certain organosilicon compounds.”)[2] In addition to finding that Dow Chemical was “aware of the probable dangerous consequences of its conduct,” the jury also specifically concluded that Dow Chemical “willfully and deliberately failed to avoid” the dangerous consequences of silicone breast implantation. Put another way, the jury believed that Dow Chemical and Dow Corning, joint developers of the breast implant marketed by Dow Corning, were aware of what they were doing and acted in conscious disregard of the “dangerous consequences” inherent in placing silicone in the human body in the Dow Corning Silastic II.
In its brief, Dow Chemical’s first response to the damning consequences of the special verdict is that there is “no evidence that Dow Chemical knew that breast implants were likely to be dangerous.” (Emphasis in Dow Chemical’s brief.) Dow Chemical’s second argument is that there is not “any basis for the plaintiff’s claim that it willfully and deliberately breached a duty to stop Dow Corning from selling breast implants.”
With regard to the first argument, it appears to me that there is quite a bit of evidence from which the jury could have concluded that Dow Chemical “knew” that breast implants were likely to be dangerous. The overriding answer to Dow Chemical’s contention is that by virtue of such Dow Chemical-Dow Corning arrangements as their “joint development program,” their “joint research agreement,” their mutual “obligation of confidence and nonuse” (relating to the biological activity of silicone) and, especially, the joint testing of miniature breast implants in dogs, whatever Dow Corning knew about the dangers of biological uses of silicone, Dow Chemical probably knew of the dangers, as did Dow Corning. It is plain that the two Dow companies had been working together for years on the use of silicone for medical purposes and that in later years they worked together on the development of breast implants.
*1511 I give special significance to Dow Chemical’s declaration of its control over Dow Corning in its agreement with Dow Corning, dated May 5, 1975. In this written document, Dow Chemical and Dow Coming concur in the understanding that from the time Dow Corning was formed in 1943, Dow Chemical and Corning Corporation had “controlled equally” the share capital of what Dow Chemical calls its “Associate Company” namely, Dow Corning, and that, since that time, Dow Chemical and Corning Corporation have “controlled its [Dow Coming’s] operations, including the quality of its goods and services.” (Emphasis added.) Although Dow Chemical may argue in its brief “that there was no evidence that Dow Chemical knew that Dow Corning was misrepresenting the safety of its products,” it seems to me that if Dow Chemical had been controlling Dow Coming’s operations, as it says it was, and was controlling the quality of its goods and services, it is hard for Dow Chemical to argue that it did not know that Dow Corning was misrepresenting the safety of the Silastic II.
There is other evidence (other than Dow Chemical’s declaration that it had control over the operation of Dow Corning and the quality of its products) that Dow Chemical knew that silicone breast implants were potentially dangerous and that Dow Corning was “misrepresenting the safety” of this product.[3] Actually, given the state of this record, it is a very difficult task for Dow Chemical to deny that it did not know about the dangerous potential inherent in placing the Silastic II silicone gel into the human body. Dr. Marc Alan Lappé, toxicologist, medical ethician and expert in the field of silicone chemistry, testified that Dow Chemical possessed the “key findings of adverse effects of the components of Dow Coming’s silicone based breast implants.” Dr. Lappé pointed out that although Dow Chemical had knowledge about such things as the migration of silicone throughout the body and silicone’s ability to “bleed” out of its elastomer shell, Dow Chemical “did not report the studies that would demonstrate what the toxicologic properties were of the known components of silicone gel.” Dr. Lappé went so far as to testify that if Dow Chemical had disclosed the details of the Dow Chemical “research program into . . . how polydimethylsiloxanes used in implants had effects on the immune and central nervous system, *1512 ... the implants would have been taken off the market long before 1992.”
As further evidence of Dow Chemical’s knowledge and its joint role in a number of experiments relating to the principal component of breast implants, the DC 360 silicone fluid, Dow Chemical admits, as put in its opening brief, that “Dow Chemical tested or participated in tests involving DC 360 fluid, which was later used ... to make the gel in Silastic II implants.” Dow Chemical also admits in its brief that it “conducted or participated in approximately ten tests on DC 200 fluid, which is an industrial silicone fluid that is chemically similar to the DC 360 fluid” that was used in Mrs. Mahlum’s implants. Dow Chemical appears to be arguing that even though it tested the silicone fluids that were later used in the implants, it did not do so for the specific [1] ‘purpose of determining whether it was safe for use in a medical implant.” It is hard for Dow Chemical to maintain such a position given its admission that it “tested or participated in tests involving DC 360 fluid.” Dr. Lappé testified that DC 360 was used as the major component in the 1970 “miniature breast implants” test in dogs and that the implant experimenters were “following an outline that had been laid out by Dow Chemical and sent to FDRL, to Dr. Carson.” (See page 8.) The record belies Dow Chemical’s assertion that it did not test components of Silastic II (namely, DC 360 and similar organosilicon compounds) for the purpose of determining the safety of these components for use as medical implants. As I see it, whatever responsibility that Dow Corning might have for employing DC 360 in medical implants must be shared with Dow Chemical, there is evidence to support a jury finding that Dow Chemical should share that responsibility, perhaps equally, with Dow Corning.
From the tests that Dow Chemical “conducted or participated in,’ ’ Dow Chemical was likely to have known, at the very least, that the mentioned silicone liquids, when introduced into the bodies of mammals, migrated throughout the bodies of the test animals. (See, e.g., 1956 study by Dr. M. B. Chenoweth of Dow Chemical’s biochemistry department.)
As I have said, Dow Chemical’s position seems to be that although it safety-tested the principal component of breast implants, it did not test silicone implants as such. To this contention I say that, even without considering the Dow Chemical-designed experiment with miniature breast implants, the evidence seems to show that Dow Chemical and Dow Corning jointly “participated” in the development and safety-testing of a substance designed to be placed within the human body and that the two companies should share in responsibility for the adverse consequences associated with placing the substance within the human body.
*1513 I see as the gist of the Mahlums’ claim against Dow Chemical the two Dow companies’ having “participated” and worked together[4] in developing and testing a form of silicone that was intended by both companies to be placed inside the human body. Whether one wants to say that the two companies are jointly liable for carrying out this activity or to say that Dow Chemical “undertook” the task of assisting Dow Corning in doing so, the facts support a conclusion that both Dow Corning and Dow Chemical had a duty to Mrs. Mahlum and other intended users of DC 360 to insure that the substance could be used safely for its intended internal-implantation purpose or, at least, a duty to warn of the dangers which were known to both Dow Chemical and Dow Corning.
In its opening brief, Dow Chemical argues: “Dow Chemical never specifically undertook to render any advice with respect to the safety or suitability of silicone for use in breast implants and therefore cannot be liable for its alleged failure to recommend long-term testing.” The record, and particularly the testimony of Dr. Lappé, repels this assertion. The miniature breast implant study alone tells us that Dow Chemical not only rendered “advice” in this testing, Dow Chemical people designed and supervised these medical tests, tests that can only be described as breast implant tests.
From at least the time of the Chenoweth Study in 1956, we know from Dr. Lappé that Dow Chemical and Dow Corning were investigating together the biological reactivity of certain kinds of silicone and were working toward the “increasing use of siloxanes for medicinal application.” (Emphasis added.) From the time of the Chenoweth Study, both companies were aware that when these silicone compounds were injected into a mammalian body they migrated throughout the body, with injury being done to a number of organic systems. The jury knew, then, that the two companies were involved in more than just “basic research,” that they were jointly testing chemicals for a “particular purpose,” that purpose most likely being to determine whether DC 360 could be safely used medically within the human body. The issue here, then, is not the Mahlums’ seeking to hold Dow Chemical liable for faulty, basic research on silicone products. The Mahlums, on *1514 the state of this record, can credibly charge Dow Chemical with actively collaborating with Dow Corning and participating with Dow Corning in the research and development of DC 360, not only for general, internal medical uses, but for the specific use in breast implants, as evidenced by the miniature breast implants which were the subject of the Dow Chemical-Dow Corning, four-dog study. This study was completed in 1970, using miniature silicone gel breast implants. Four dogs were examined after six months and twenty-four months from the time of implantation. One of the dogs died after eleven months, from causes not related to the experiment. This dog, on autopsy, exhibited evidence of liver and kidney congestion and some fibrous tissue reaction at all of the sites of implantation. With reference to the three surviving dogs, after twenty-four months, almost all of the implantation sites had severe or moderate chronic inflammation. A report of the study, co-authored by Silas Braley of Dow Corning, was published in 1973. According to Dr. Lappé, the report falsely told the “scientific community there were no differences at six months and two years and provide[d] only six month’s data.” Dr. Lappé testified that the Braley Report does not give the scientific community a chance to perform an independent evaluation of the two-year data and falsely represents that the results were the same at six months and twenty-four months. Further, the report failed to say that one of the dogs had died (stating that all four had survived) and did not report the adverse reactions appearing in the autopsy report of the dog that had died.
According to Dr. Lappé, there was another study done by Dow Chemical Company on DC 360 fluid in 1970. This study contains a pathology report of what happens when DC 360 fluid is injected into rats. Dr. Lappé was asked: “What [did] Dow Chemical find out about silicone and where it goes in bone marrow in 1970, sir?” His answer:
[T]he test animals developed vacuolizations which were evidence to them of the presence of silicone in the bone marrow. That is where blood products are produced, the cells of blood are produced primarily in the bone marrow. They also found evidence of lung congestion and evidence of involvement of the liver.
The experiment also found a statistical difference in brain weight in the experimental animals. Dr. Lappé considered it to be significant that this was a Dow Chemical Company internal company report and that, according to Dr. Lappé, it was not filed with the FDA or shared with the scientific community. Dr. Lappé also testified that Dow Corning published a report in its own name that “reads word for word identical” to the Dow Chemical report *1515 referred to. All reference to Dow Chemical was deleted in the second, identically-worded Dow Corning report.
Dr. Lappé further testified about two 1973 pathology studies conducted by Dow Chemical “on various silicone implant specimens [involving] tissue specimens taken from rabbits that have been either control or were treated with Dow Corning materials.” Experimenters, according to Dr. Lappé, “all [found] evidence of chronic inflammatory reaction characterized by what are called multinucleated giant cells in this particular study.”
All of Dr. Lappé’s testimony is very much in line with a “joint development agreement” made by Dow Chemical and Dow Corning in 1967. This agreement, both a “joint research agreement” and a “joint development agreement,” pertained to “DC 555 and compounds derived from and related thereto.” The subject of the Dow Chemical-Dow Corning agreement was “the physiological effects resulting from the ingestion or injection into the systems of animals or men of particular physiologically active silicone, wherein in principle, the parties shall jointly share the costs and shall share the profits and losses of any commercialization.” Minutes of a Dow Chemical board of directors’ meeting referred to an October 1, 1966, agreement between Dow Corning and Dow Chemical for the “research and commercial development in the field of physiological effects of certain organosilicon compounds,” which Dr. Lappé takes to be referring to the determination by these two companies of “whether or not the compounds, like DC 360 or 200 or 555, would have an effect that would perturb or upset or enhance the human body’s basic physiological or metabolic life sustaining activities.’ ’
Also put into evidence were the March 1977 minutes of the annual meeting of stockholders of Dow Corning. The minutes contain a document entitled “Dow Chemical Company Evaluation of Bioactive Organosilicon Compounds.’ ’ There can be no denying of Dow Chemical’s ongoing interest in silicone research for medical purposes. In 1969, the two Dow companies signed an agreement to work together in a “joint development program” relating to the “biological activity of certain organosilicon compounds,” in which the two companies agreed to “maintain such information in confidence” and neither would use the results for its own commercial purposes. All in all, there would seem to be an abundance of evidence to support a jury finding that Dow Chemical “knew that breast implants were likely to be dangerous.”
Dow Chemical’s second argument is that there is no evidence that it “willfully and deliberately breached a duty to stop Dow Corning from selling breast implants.”
I find this to be a very interesting and revealing contention. *1516 Dow Chemical seems to be saying that even if it did know that the breast implants were “likely to be dangerous,” it would not be liable to users of the device because it was under no duty “to stop Dow Corning from selling breast implants.” The way Dow Chemical puts this argument goes to the very heart of its defense, which is: “We are merely a stockholder in Dow Corning; and, if Dow Coming decided to develop and market a dangerous product, we had no duty to stop them and, for that matter, did not have the power to stop Dow Corning if we so chose.” If Dow Chemical had neither the duty nor the right to “stop” Dow Corning “from selling implants,” Dow Chemical could not be guilty for any misconduct engaged in by Dow Coming. The problem with Dow Chemical’s argument, however, is that it fails to recognize that the jury could have found what might be said to be the real relationship between Dow Chemical and Dow Coming, which is that Dow Chemical “operated,” “controlled,” assisted and otherwise “jointly” worked with Dow Coming in the development and probably the marketing of this potentially dangerous product. Once this is recognized, the jury could have concluded that it makes just as much sense to say that Dow Corning “failed to stop” Dow Chemical as it does to say that Dow Chemical failed to stop Dow Corning. Again, Dow Chemical cannot rely on its “We-are-just-a-stockholder” defense. There is much more to it. Sure, if Dow Chemical were only a stockholder, it would have no duty, no right to “stop” Dow Corning from doing the things that it did; but the jury could, from this evidence, have found that Dow Chemical acted in a role that went far beyond just being a stockholder.
If the jury believed the evidence bearing on Dow Chemical’s control over “the quality of [Dow Coming’s] goods and services” and Dow Chemical’s operation of Dow Coming, then it is not too large a step for the jury to have found that both companies had “act[ed] with conscious disregard of the safety” of Mrs. Mahlum.
Witness Dr. Marc Lappé gave powerful affirmation to the Mahlums’ punitive damage case when he testified with a “strong and decisive yes” that Dow Chemical had “demonstrated conscious disregard for the safety and welfare of the ultimate users of products that it had direct or indirect control over.’ ’ Dr. Lappé testified that
for a protracted period extending up to the time of Miss Mahlum’s implant, Dow Chemical by its own actions initiated control over toxicology testing in the ’50s and ’60s that would be done on components of Dow Corning breast implants. Thereafter, . . . they [Dow Chemical] participated *1517 in selecting for the test labs, they knew and referred Dow Corning to the proper testing individuals in their view.
Most persuasive to me is Dr. Lappé’s testimony that “Dow Chemical had and did exercise control over what went into these external tests by actually designing the test for Dow Corning of what a toxicological assay would look like.” (Citing the “specific test that moved [Dr. Lappé] the most,’ ’ namely, a test laid out by Dow Chemical, in which “the analog of a breast implant,” “miniature breast implants” were placed experimentally in dogs.)
Dr. Lappé’s testimony is very much in harmony with the previously quoted language in the Dow Chemical-Dow Corning agreement of May 5, 1975, stating that Dow Chemical had control of Dow Coming’s operations, “including the quality of its [DowComing’s] goods and services.” It seems to me that the jury had sufficient evidence to conclude that Dow Chemical and Dow Corning have been in the silicone research business together for many years and that one of the products of their “joint research” was the Silastic II. It is difficult, then, to give much credence to the argument in Dow Chemical’s brief that “it had no knowledge of any dangers associated with silicone gel breast implants.” With regard to Dow Chemical’s argument that it “did not willfully and deliberately breach[] a duty to stop Dow Corning from selling breast implants,” the argument is misplaced. It continues to assume that Dow Chemical is only a stockholder and that it, therefore, has no duty to “stop” Dow Coming’s illicit activities. The jury, as I have pointed out, could very well have found that Dow Chemical and Dow Corning shared a general duty to stop “selling breast implants” or, rather, not to sell them at all until proper testing had been done.
As I see Dr. Lappé’s testimony, it has the value of being both opinion evidence and percipient evidence. Dr. Lappé gave his opinion, “based on all the evidence available to me,”[5] that Dow Chemical was guilty of a conscious disregard of Mrs. Mahlum’s safety and welfare. The Dow Chemical brief is devoted to the inadmissibility of Dr. Lappé’s testimony as to “due care” but says little or nothing about his “conscious disregard” testimony. Dr. Lappé qualified as an expert in the field of medical ethics, and I find nothing in Dow Chemical’s arguments that would lead me to disregard Dr. Lappé’s testimony or to say that it had not been properly considered by the jury.
Dr. Lappé gave testimony, based on his “understanding and' knowledge of the standards for animal testing,” to the effect that *1518 Dow Chemical did not conduct the studies that it did do “with an end in mind of protecting the public or use reasonable care in the design and conduct of follow-up studies to assure that results that suggested adverse finding could be confirmed or rejected.” Even if the opinion portion of Dr. Lappé’s testimony were to be rejected, Dr. Lappé provided supporting factual testimony for his opinion, testifying, without objection, that Dow Chemical had “concealed the hazards of the silicone fluids that went into silicone gel breast implants.’ ’ There is no reason why the jury could not have properly concluded from this evidence that Dow Chemical did, in fact, conceal known dangers of silicone breast implants from persons whom Dow Chemical knew were going to be using the dangerous product. From the conclusion that Dow Chemical was concealing known dangers, the jury could reasonably have concluded from the facts of this case that Dow Chemical did so “willfully and deliberately” and, hence, in “conscious disregard of the safety of others.”
The only remaining subject that calls for discussion is identification of the legal rubric that should be applied to cases in which a jury makes a specific finding that implied malice is present by reason of proof of a conscious disregard of the safety of others. A number of theories of liability may be properly applied to this case. The majority has affirmed the trial court’s judgment that Dow Chemical negligently performed its undertaking to assist Dow Chemical in researching the safety of breast implants and advising Dow Corning with respect to the safety of its product. When we consider this tort liability in connection with the jury’s having concluded, by clear and convincing evidence, that Dow Chemical is guilty of implied malice, conscious disregard of Mrs. Mahlum’s safety, we need go no further. We have tortious conduct on the part of Dow Chemical coupled with the requisites of implied malice. As I see it, this, by itself, supports a jury finding that Mrs. Mahlum is entitled to recover punitive and exemplary damages.
I would also note that plaintiffs have judgment in this case on the basis of Dow Chemical’s having fraudulently concealed from Mrs. Mahlum and other breast implant recipients the dangerousness of this product. Judgment was entered on two bases: Dow Chemical’s having aided and abetted Dow Coming’s fraudulent misrepresentations and Dow Chemical’s having acted in concert with Dow Corning in concealing the dangers.
I recognize, as maintained by Dow Chemical in its briefs, that Nevada has not recognized either concert of action or aiding and abetting as tort actions. This should not prevent this court from recognizing these torts in a case like this, where Dow Chemical controlled Dow Corning and worked hand-in-hand with Dow *1519 Corning in developing and marketing the Silastic II. Acting in concert is, to me, the clearer of the two actions because the jury could have believed that Dow Chemical was more of a principal than it was an aider and abettor. My own view is that the jury would have been entitled from the evidence submitted to it to decide that Dow Chemical was more culpable than Dow Corning, that Dow Corning was actually a relatively innocent agent of Dow Chemical, which directed and controlled the whole breast implant “operation.” One does not have to go that far, however, to justify the jury’s verdict and the punitive damage award against Dow Chemical. All persons who received these implants were owed the duty to be informed that they were subject to the dangers that were inherent in the product that was designed, produced and marketed at the very least through the collaboration of the two Dow companies. Dow Chemical and Dow Corning shared a duty and responsibility to Mrs. Mahlum not to allow a dangerous product to be put into her body or, at the very least, to warn Mrs. Mahlum of the dangerousness of the product. Both Dow Chemical and Dow Corning are liable to Mrs. Mahlum for fraudulent concealment.
Although the jury’s finding that Dow Chemical aided and abetted Dow Corning is not so substantial a case as its finding that the two companies acted in concert, I do not believe that the aiding and abetting judgment should be set aside. I see no reason why the jury in this case could not have found that Dow Chemical aided and abetted Dow Corning (although it is more likely that Dow Corning aided and abetted Dow Chemical in Dow Chemical’s rush to corner the market in breast implants without conducting the proper human and animal epidemiological studies).[6]
*1520 Dow Chemical argues in its brief that the aiding and abetting and the concert of action instructions “effectively allowed the jury to find Dow Chemical liable for fraud for failing to supervise Dow Coming’s breast implant business.” This to me is a very hollow argument and is based, again, on Dow Chemical’s trying to convince this court that its only connection to “Dow Coming’s breast implant business” was that it was just a stockholder. That Dow Chemical had a much larger role in the breast implant story than just as a stockholder in Dow Corning should be apparent to any reader of this record.
I understand that the jury denied liability on the civil conspiracy claim; but this does not mean that the two companies were not acting with one another to bring about a preconceived result, namely, to gain by marketing a product that was known to be dangerous or by marketing a product without adequately apprising its prospective users of the dangers inherent in the product’s use.
I would have no hesitancy in affirming all of the trial court’s judgments.

I join the majority in affirming the negligent undertaking judgment; still, Dow Chemical has presented some very persuasive arguments on the question of causation. The plaintiffs have, of course, the burden of proving that the chemical compounds which make up the implant were a substantial factor contributing to the harm suffered by Mrs. Mahlum. I have no trouble with the causation issue as it relates to the severe local reaction caused by the implants. I am aware, however, that proof of causation as to autoimmune and systemic disease is problematical, principally because these disorders frequently occur in the absence of implants and because a very large body of investigators does not accept the correlation between implants and systemic disease. Although recognized connective tissue disorders are regularly encountered by breast implant recipients, it would appear that there is a paucity of epidemiological evidence to indicate that women with implants are more likely to develop these disorders than women without implants. In my view, under the circumstances of this case, Mrs. Mahlum should not have to wait for a “general acceptance” or other indicia of biomedical consensus that implants cause systemic harm as a condition to her proceeding with her claim against Dow Chemical. In agreeing with the majority, I take the position that there is nothing in this record that prevents us from accepting case-specific causal analysis upon which the Mahlum claim is based.

Subsequent to the Dow Chemical and Dow Corning “joint development program,” came an additional agreement on August 14, 1969, in which Dow Corning and Dow Chemical with Dow Chemical’s subsidiary, LePetit SpA, the international distributor of the breast implant, agreed to carry out further work in the area of “biological activity” of silicones. The August 14 “obligation of confidence and nonuse” undertaken by the three companies required “technical information” concerning biological activity of silicones to be held in confidence; and each company agreed that it would not use the biological information developed in their joint development program for “commercial purposes” other than as joint developers of the biological products contemplated by the agreement.

Dow Chemical stated that it “controlled” (past tense) Dow Coming’s operations and the quality of its goods. Now it claims that the statement was untrue and that it was merely meaningless “boilerplate” that was necessary to preserve its right to “use of the ‘Dow’ mark.” Dow Chemical argues that there was “no evidence” that Dow Chemical “actually controlled the quality” of Dow Corning products. Whether Dow Chemical actually controlled Dow Corning or was deceiving the Patent and Trademark Office is a matter for the jury to decide.

A particularly poignant indication of the collaborative arrangement between the two Dow companies is the reference in a February 1, 1967, board meeting to a
joint research agreement with Dow Chemical Company pertaining to certain silicone products . . . and [a] joint development agreement relating to the physiological effects resulting from ingestion or injection into the systems of animals or men of particular physiologically active sili-cones, wherein in principle, the parties shall jointly share the costs and shall share the profits and losses of any commercialization.

Dr. Lappé testified that he had reviewed approximately 10,000 documents and that he had screened 205 CD-ROM disks, each of which had 20,000 or more pages that pertain to the documents involved in breast implant litigation.

It can be inferred from Dr. Lappé’s testimony that Dow Chemical was motivated by haste in its decision to conceal information and thereby get the product on the market “before it was ready,” so to speak. Dr. Lappé testified that he had studied the history of tests done by the two companies and that, up to the time that Mrs. Mahlum received her implant, Dow Chemical had never suggested to Dow Corning that Dow Corning or Dow Chemical do a long-term study on the material used in the implant. Dow Chemical did not advise Dow Corning that it was “seeing some inflammation . . . seeing some toxic effect, it’s not inert.” Instead, testified Dr. Lappé, “Dow [Chemical] did not report key findings of adverse effects of components of Dow Coming’s silicone based breast implants. They didn’t report the studies on the composition of bleed. They did not report the studies that would demonstrate the toxicologic properties were of the known components of silicone gel.” According to Dr. Lappé, “Dow Chemical had and did exercise control over what went into those external tests by actually designing the test for Dow Corning of what a toxicological assay would look like.” Notwithstanding, according to Dr. Lappé, “Dow Corning directly concealed some of the most *1520 relevant information that would have been useful for physicians implanting devices and the scientific community studying the effects of silicone” and, particularly, the information “that silicone gel had profound immunologic activities, and that those immunologic activities could adversely affect the human body . . . .” The conclusion that can be drawn from the Lappé testimony is that this device was marketed at a time when far too little was known to enable patients to make an informed choice. Whether premature release of these devices was prompted by a desire to be first in the marketplace, I cannot say; but I do think that the jury would have been justified in so concluding and could have taken this as evidence of implied malice.

I wish to emphasize that any conclusions I have drawn regarding Dow Chemical’s liability have no implications as to the Mahlums’ action against Dow Corning. It has not escaped my attention that Dow Corning sought bankruptcy protection on the eve of trial, thus neutralizing the traditional direct products liability claims the Mahlums may have had against it and leaving them to proceed to trial solely against Dow Chemical.